# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEAN M. ROONEY, <br> Petitioner, <br> v. <br> JOE A. LIZARRAGA, <br> Respondent. | Case No. 15-cv-00395-JST (PR) <br><br> **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Sean M. Rooney, challenging the validity of a judgment obtained against him in state court. Respondent has filed an answer to the petition, and petitioner has filed a traverse. For the reasons set forth below, the petition is denied.

## I. PROCEDURAL HISTORY

In June 2012, an Alameda County jury found petitioner guilty of first degree murder and found true an allegation that petitioner used a deadly weapon during the commission of the crime. Ex. 1 at 338, 409-410.[1] The trial court subsequently sentenced petitioner to 26 years to life in state prison. Id. at 415.8-415.11.

On November 27, 2013, the California Court of Appeal affirmed the conviction in an unpublished opinion. Ex. 7. On February 11, 2014, the California Supreme Court denied review. Exs. 8, 9.

On January 28, 2015, petitioner filed a habeas petition containing one exhausted claim in this Court. ECF No. 1. The Court granted petitioner's request to stay this action so that petitioner

---

[1] All references herein to exhibits are to the exhibits submitted by respondent in support of the answer, unless otherwise indicated.

could return to state court to exhaust his remedies as to additional unexhausted claims. ECF No. 8. On December 16, 2016, this Court denied petitioner's request for leave to amend his petition to include the additional claims, finding them barred by the statute of limitations. ECF No. 25. The Court directed respondent to answer the one exhausted and timely claim in the petition. Id.

## II.  STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal:[2]

> During the weekend after Thanksgiving of 2009, defendant noticed a Craigslist ad he found insulting and relating to him personally. Defendant also concluded the listing was posted by his former lover, John Frum. Defendant believed the listing was a dangerous "omen" and he became very concerned about it. A few days later, on December 1, 2009, defendant went to Frum's apartment with a rubber mallet. At the apartment, defendant went to the parking area and vandalized the car of Frum. He used the mallet to smash the car's windows and body. Defendant then climbed to the second floor of Frum's apartment. He used the mallet to break the windows along the deck and entered the unit. Once inside the apartment, defendant attacked Frum. Frum was forced to flee the unit screaming for his neighbors to help him. Defendant pursued Frum with a knife. Eventually, defendant caught up with Frum in front of the apartment. He proceeded to stab Frum 14 times, eventually, leaving the blade of the weapon in the sternum of the deceased. The blood loss triggered the death by exsanguination.
>
> One of the witnesses to this offense was Desmond Morris. He lived on the second floor of 3149 Brookdale Avenue, apartment 5, in Oakland. The Brookdale address had eight stories, a gate that blocked the front of the property from the street, and a first-floor laundry room near the carport. Morris was the next-door neighbor of the victim, John Frum.
>
> On December 1, at approximately 9:00 a.m., Morris was in the laundry room of the building. He noticed Frum's car in the slot assigned to the victim and it was in normal condition. Morris left the building at 10:00 a.m. for a job interview. He returned to his home at 10:30 a.m. and called his girlfriend. While talking, he heard a considerable amount of banging noise. He looked out his kitchen window, but saw nothing. More banging noise was heard coming from the parking area of the building. It was the sound of glass breaking and force hitting metal.

---

[2] The Court has independently reviewed the record as required by AEDPA. Nasby v. McDaniel, 853 F.3d 1049, 1055 (9th Cir. 2017). Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, unless otherwise indicated in this order. Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

Morris looked out his window and saw Frum walking quickly on the walkway toward his apartment. Frum then entered his unit and closed the door. Within seconds, Morris heard the sound of broken glass. Shortly after the noise subsided, the neighbor heard Frum yell, "[P]lease help, call the police."

Looking through the front door peephole, Morris saw Frum running toward the front stairs. Frum was yelling in a loud voice for someone to "call the police. Help, I need help." Frum then declared, "Please call the police, he is trying to kill me." Morris continued speaking with his girlfriend and indicated he was reluctant to get involved. He did not call the police, but speculated his girlfriend may have based on what he stated.

Within a few minutes, Morris heard someone outside the building yell to put the weapon down and "freeze." From his balcony vantage point, Morris saw about five police officers, Frum and defendant. Morris then exited his apartment heading towards the back stairs. As he passed Frum's unit, he noticed broken glass all over the place. He also saw drops of blood alongside Frum's front door.

As Morris neared the front of the building, he saw Frum sitting on the stairs. Frum tried to stand up, but police advised him to remain seated. He was clearly bleeding from the neck and underarm. The defendant was also with the police. Morris had known defendant because the suspect had lived with Frum in the building. Morris believed defendant had moved out of the property approximately eight months before this date. On this date, defendant was quite aggressive and hostile, calling Frum a "bitch" and yelling "fuck you." Defendant also told Frum, "I told you I was going to get you."

Morris walked across the street to join other spectators. He saw the ambulance come for Frum and the police forcibly restrain defendant. Defendant was tased two times before taken away in an ambulance himself.

Another witness, Yvette Horn, lived at 3208 Brookdale Avenue, across the street from the victim's home. On December 1, at 11:30 a.m., she heard window glass breaking. She saw a familiar person on the balcony of the second floor. She knew the person from the area and had last seen him about a year ago. He had been in the company of a neighbor walking the dog. The two men had lived together. When she saw the man on the balcony that day, he had a mallet or hammer in his hand.

Horn saw the man with the mallet break the window glass several times and look inside the apartment. She then saw the man enter. Then she heard someone scream and call for help. Horn called 911 for help. While she was speaking with the dispatcher, Horn saw a police car travel down the street and called out, pointing at the apartment across the street.

As the police pulled up, Horn saw the victim exit the apartment calling for help. There was blood on his upper shirt. She also saw the suspect following Frum telling him, "you better run." Eventually, the pursued victim stopped in front of the mailboxes of the building. When defendant reached the street, he ran up to Frum and stabbed him 10-20 times.

Horn also observed the police admonish defendant to stop what he was doing, but he did not. An officer eventually grabbed defendant and made him drop the weapon. The

3

company of officers had to pin defendant down on the ground. He continued to struggle with the police, appearing to try to get away. The police eventually strapped defendant onto a gurney. Horn heard defendant yell, "[W]as it worth it?" Before strapping the suspect, the police tased him.

Officer Thomas Lopez was a responder to the incident. He observed Frum running from the second floor of the building towards the front entrance. He was calling for "help." Lopez also saw defendant approximately five feet behind Frum. When Lopez saw defendant he was holding a 10-inch knife. Pursuing the bleeding Frum, defendant caught up with the victim at the front gate area. In front of Officer Lopez, defendant stabbed the victim "two to four" times in the upper torso, shoulders and chest area. Frum tried to cover his head. Lopez did not see Frum fight back in any way. Even as Lopez drew his weapon and ordered defendant to stop his conduct, the suspect would not cease. Lopez said to defendant, "Stop or I will shoot you." Defendant stabbed Frum two more times and then dropped the knife.

While defendant was being subdued by Lopez and other police officers, he remained agitated and challenging. He kept saying, "That's what you get, John. You're the biggest meth dealer. You deserved it. You deserve to die. I hope you die." In fact, defendant continued his aggressive posture even when he was warned he would be tased. He eventually had to be tased. Lopez found no evidence defendant manifested symptoms of alcohol intoxication. Lopez did indicate, based on the aggressiveness of defendant, that he could have been under the influence of a stimulant.

Sergeant Wing Wong also arrived at the Brookdale address. Wong saw a knife blade protruding from the chest and throat area of Frum, and blood covered his shirt. Defendant kept saying the victim was "the biggest meth dealer," and that he hopes the man dies.

A team of paramedics arrived for the victim and another for defendant. The defendant had cuts on his hands and blood on his body.

All during this time, the defendant remained very resistant. Tasing did not subdue him for a substantial period. At one time, defendant had a loose handcuff around his wrist and was swinging it at the people handling the scene. Officer Brett Estrada had to tase defendant twice. Estrada thought defendant could have been under the influence of a stimulant because of his behavior. After the tasing, defendant became calmer.

Officer Richard McNeely of the Oakland Police Department also responded to the scene. Among the places he checked out was the parking area where Frum parked his car. McNeely saw a silver Honda that had been vandalized in the carport.

Son Tran was a paramedic who came to the scene at noon. He observed the very hostile demeanor of defendant and his refusal to comply with the police. He was tased at least two times before the paramedics could successfully strap him onto a gurney. While in the ambulance, Tran noticed several lacerations on the defendant's right hand. He asked defendant if he had ingested drugs or alcohol. The accused answered in the negative. Tran found defendant lucid and coherent. Altogether, Tran was in the physical presence of defendant for approximately one hour. He did not observe symptoms of alcohol intoxication. Tran recalled in the ambulance that defendant was crying and declared

4

someone had cheated on him.

Crime scene technician Cheryl Cooper arrived at the apartment building at 12:10 p.m. She noticed the victim had numerous stab wounds and was in a bloody condition, speaking erratically on a gurney. The blade of a knife protruded from his neck. Entering the front gate of the building, Cooper saw blood spatter on the wall and a pool of blood by the mailboxes in the front. She collected a broken knife blade, a shoe and silver chain. At the front of Frum's apartment, Cooper observed broken glass, overturned flower pots and a broken window in both the bedroom and living room. Inside the unit, Cooper noted the place was in considerable disarray, "as if things were turned over." The broken wooden handle from a hammer was found on the floor. Also, the mallet head was on the desk in the apartment. Cooper also found a knife handle in the hallway. In the bedroom, she found a broken window and blood on the pillows.

This criminalist went to the carport and inspected Frum's car. There were dent marks all over the car, most circular in nature. They were fresh marks. The damage appeared caused by a mallet head.

Sergeant David Cronin was at the crime scene at noontime. He accompanied defendant in the ambulance to the hospital. During the ride, defendant began crying about what had happened. He appeared rational and coherent to the sergeant. He had screwed up his life. He was angry at Frum for what he had done to him. Frum was involved in drugs, namely methamphetamine and defendant asked Cronin to search Frum's apartment. Frum was a big drug dealer. Defendant asked Cronin if Frum was dead and the officer replied in the negative. With that, defendant said, "I hope the fucker is dead. I want him dead for what he did to me." Defendant asked Cronin if he "was going to prison for 20 years behind that fucking liar?" Then defendant told Cronin the two men had dated, but broke up two years before and that defendant had not seen Frum much in the past year. Defendant described Frum as his lover and a methamphetamine dealer. Frum had ruined his life.

Defendant then told Cronin that within the past week, he had seen an ad in Craigslist which upset him. Defendant had sought to speak with Frum concerning a dog that might have to be euthanized. After reading the ad, defendant consumed vodka and decided to visit Frum at his home. He told Cronin he wanted to kill Frum for the pain the man had caused him. When the defendant again asked if Frum was dead, Cronin told him he was not, but would have a serious scar on his chin from the wound. Defendant then said the scar was not enough for what Frum had done to him and restated he wanted to kill Frum. During the trip, defendant did not seem under the influence of alcohol. He was not really questioned by Cronin because of his emotional and irrational condition.

The victim Frum was taken to Alameda County Medical Center for treatment. He was a man in his 50's, and had several substantial stab wounds to his upper body. He presented wounds to the neck, chest and face. The blade of a knife was still protruding in his chest through the sternum or breast bone. Once his chest was opened, the blood loss was so substantial it would not coagulate. Dr. Gregory Victorino simply could not stop the bleeding. He noticed there were lacerations to Frum's diaphragm, liver and right kidney. Blood tests of Frum disclosed the high level of methamphetamine in his system. The pathologist, Dr. David Levin, performed the autopsy on Frum on December 3, 2009. He concluded the cause of death was "multiple stab and incised wounds" to the victim's body.

5

Frum had 14 fresh stab wounds.

The defense case focused primarily on the testimony of defendant. Much of it concerned how defendant and Frum met and became intimate with each other. They began dating around December 4, 2006. The pair used Craigslist to solicit additional men for intimate relationships. They both believed in "full disclosure" of their dating life and Craigslist would be the vehicle for meeting new people. The couple broke up when Frum disclosed he had cheated on defendant.

They subsequently engaged in a series of on-and-off relations with each other. Defendant testified Frum would cheat and the two argued. He related that Frum would become upset with defendant and take his car keys and other possessions. On one occasion, defendant told Frum he was going to his boss's home which triggered Frum into taking defendant's keys and hitting him numerous times. By October 2008, the couple was still seeing each other, but was often having arguments. During that month, Frum hit defendant with a broomstick and the police were called. After this incident, the couple tried to reconcile, but Frum had another man living with him and the two men did not get back together.

During the weekend of Thanksgiving 2009, defendant checked out Craigslist for the first time since they broke up. Defendant observed several entries in the "style" Frum used for such entries. One ad identified by defendant in his testimony as significant was: "Beware. This guy is a smart ass and he will come over to your place and try to use your computer to find out who your friends are. Someone should do something about him." Defendant took this entry as an "omen." He believed the entry was an omen designed by Frum to hurt him.

From the first reading of the "omen," defendant obsessed over the note and became upset at what Frum had done. On the day of the homicide, defendant consumed vodka and four Zoloft tablets. He drove to Frum's apartment to discuss the listing and find out about the couple's dog Jetta who was sick. Once defendant arrived at Frum's home, he entered the parking area and began hitting the car. He then ran up to Frum's apartment and proceeded to break all the windows. He did not know why he did this. He did not recall much anything else about the incident.

Defendant acknowledged he was taller, heavier and younger than Frum. On his Craigslist ads, defendant would describe himself as a jock or muscular. He testified that, during the October 2008 incident, Frum choked him for 30 seconds. However, he affirmed he told the police the couple had no prior violent acts between them. He said this to protect Frum. Since the couple broke up for the last time in January 2009, defendant had no contact with Frum until the day of the homicide.

On the Saturday before the homicide, while looking at Craigslist, defendant noticed the listing quoted above. He testified reading the entry made him feel "[p]hysical and emotional injury due to the threats" contained in it. Defendant thought Frum was threatening him. The entry said, "Beware." He saw the entry as a threat and an omen "[b]ecause it was a forecast of a hurtful ad.... [I]t is one that I regarded as [a] possible physical and emotional threat against me. The emotional toll of that ad was profound."

Apparently, because of this deep impression and to inform Frum about the pet dog Jetta,

6

defendant decided to go to Frum's apartment. On the stand, defendant acknowledged he had no recall of the events in the apartment on the day of the homicide. While he did not want to kill Frum, he could not explain why he stabbed him 14 times.

Officer Aaron Bowie of the Oakland Police Department testified regarding the October 2008 incident when Frum allegedly choked defendant. Bowie noticed bruising on the back of defendant and recalled he was shaking and visibly upset. The officer arrested Frum at the time, and the arrestee was calm during the occurrence.

The licensed clinical toxicologist Kenton Wong also was a defense witness. He was an expert on the effect of alcohol and Zoloft on the body. Evidence disclosed defendant had a blood-alcohol concentration at 4:59 p.m. on December 1, 2009, of 0.07. The drug screen of defendant at that time was "negative." Zoloft would not appear in a drug screen, according to Wong. According to Wong, a person of defendant's body weight with a blood-alcohol read at 4:59 p.m. of 0.07 would have an alcohol level of 0.17 at 11:43 a.m. Wong also believed Zoloft tends to magnify the effects of alcohol. On cross-examination, Wong indicated that a person with a blood-alcohol level of 0.17 at the time of a crime could be only slightly impaired. Also, he acknowledged that objective symptoms of intoxication would be witnessed by persons who came in contact with defendant having that blood-alcohol level. Additionally, Wong stated that a person who began drinking at 11:15 a.m. and stopped at 11:30 a.m., and took four Zoloft pills during that time, would not have the Zoloft in his system at 11:43 a.m.

People v. Rooney, No. A136183, 2013 WL 6191869, at *1-5 (Cal. Ct. App. Nov. 27, 2013).

## III. DISCUSSION

### A. Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state courts' adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the

7

constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). Here, the California Supreme Court denied review. Thus, the last reasoned state court decision is that of the court of appeal.

**B.     Claim**

As grounds for federal habeas relief, petitioner asserts that the trial court erred by failing to instruct the jury on unreasonable self-defense as a basis for a verdict on the lesser-included defense of voluntary manslaughter. Petition at 5. The California Court of Appeal summarized

8

and rejected this claim as follows:

> The single issue raised in this appeal focuses on whether the trial court committed error in omitting any instruction on imperfect self-defense. Based on the facts presented at trial and described above, we conclude there was no legal basis for instructing on imperfect self-defense. Indeed, this legal theory of voluntary manslaughter was not even advanced by trial counsel.
>
> The trial position of the defense was this was a case of voluntary manslaughter. This theory was advanced in spite of the witness testimony regarding the stabbing death of Frum and the acknowledgement by defendant he had no recall how the killing took place. In the settling of jury instructions, the court agreed with defendant it would instruct the jury on voluntary manslaughter giving CALJIC No. 8.50.[3] However, the trial court stated it would delete the following language, "actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury" from the instruction. Defense counsel did not object to this determination by the trial court. In its charge to the jury, the court instructed on voluntary manslaughter along with murder, but limited the voluntary manslaughter instructions to the theory of provocation or heat of passion.
>
> Now, on appeal, defendant contends the trial court had a sua sponte obligation to instruct on imperfect self-defense. In a word, there is no basis for this theory of voluntary manslaughter.
>
> Our trial courts have the duty to instruct on a lesser-included offense where the

---

[3] CALJIC 8.50 Murder and Manslaughter Distinguished

The distinction between murder [other than felony-murder] and manslaughter is that murder [other than felony-murder] requires malice while manslaughter does not.

When the act causing the death, though unlawful, is done [in the heat of passion or is excited by a sudden quarrel that amounts to adequate provocation,] [or] [in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury,] the offense is manslaughter. In that case, even if an intent to kill exists, the law is that malice, which is an essential element of murder, is absent.

To establish that a killing is murder [other than felony-murder] and not manslaughter, the burden is on the People to prove beyond a reasonable doubt each of the elements of murder and that the act which caused the death was not done [in the heat of passion or upon a sudden quarrel] [or] [in the actual, even though unreasonable, belief in the necessity to defend against imminent peril to life or great bodily injury].

Cal. Jury Instructions: Criminal ("CALJIC") No. 8.50 (West 2017).

> evidence presented raises the need to so instruct. Substantial evidence is "evidence sufficient to 'deserve consideration by the jury'"– "evidence that a reasonable jury could find persuasive." (People v. Barton (1995) 12 Cal.4th 186, 201, fn. 8; People v. Flannel (1979) 25 Cal.3d 668, 684.) There is no need to instruct on imperfect self-defense when the evidence is "minimal and insubstantial." (People v. Flannel, supra, at p. 684.) In this case, the facts simply belie the need to instruct on imperfect self-defense. Rather, the uncontroverted evidence indicates defendant went to Frum's apartment after reading an entry on Craigslist. The men had not had contact since January 2009. The defendant first goes to the parking area and inflicts substantial and violent damage on Frum's automobile. He then goes to Frum's second-floor apartment and breaks in the windows with a mallet. Finally, he confronts the victim and chases Frum from his apartment onto the street where he stabs him numerous times in front of civilian witnesses and police officers. To require a sua sponte instruction of imperfect self-defense in this factual scenario would, to this court, stand the defense on its head. Add to this recipe the fact defendant presented no evidence that Frum posed an imminent threat to his safety because defendant provided no information of anything remotely threatening by the victim. Finally, no request was made by trial counsel to so instruct the jury.
>
> Our trial courts need to instruct the jury on legal theories supported by the evidence. (People v. Watson (2000) 22 Cal.4th 220, 222.) Only if that theory is credible and reasonable, based on the evidence at trial, need it be given. (People v. McDaniel (2008) 159 Cal.App.4th 736, 747.) We do not allow our trial courts to speculate and engage in conjecture to find a fitting "defense" for the accused. (People v. Memro (1985) 38 Cal.3d 658, 695, overruled on another ground in People v. Gaines (2009) 46 Cal.4th 172, 181, fn. 2.) In this case, the trial court was not asked to instruct on imperfect self-defense and we find no valid basis here to find it had to instruct based on a sua sponte duty.

People v. Rooney, 2013 WL 6191869, at *6.

A defendant is entitled to an instruction on a theory of defense only "if the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant." United States v. Boulware, 558 F.3d 971, 974 (9th Cir. 2009) (internal quotation marks omitted). Due process does not require an instruction be given unless the evidence supports it. See Hopper v. Evans, 456 U.S. 605, 611 (1982) (holding instruction on lesser-included offense required only "when the evidence warrants such an instruction"). Moreover, "[a] state trial court's refusal to give [a requested] instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding." Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988). "The error must so infect the entire trial" that the petitioner was deprived of the fair trial guaranteed by the Fourteenth Amendment. Id. "Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury." Duckett v. Godinez, 67 F.3d 734, 745

10

(9th Cir. 1995). The omission of an instruction is less likely to be prejudicial than a misstatement of the law. Walker v. Endell, 850 F.2d 470, 475-76 (9th Cir. 1987). A habeas petitioner whose claim involves a failure to give a particular instruction, as opposed to a claim that involves a misstatement of the law in an instruction, bears an "'especially heavy burden.'" Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).

Here, petitioner's claim fails for at least three reasons. First, petitioner fails to state a viable claim for habeas relief because the failure of a state trial court to instruct on lesser-included offenses in a noncapital case, such as this, does not present a federal constitutional claim. Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000).

Second, the state court reasonably determined that there was insufficient evidence to support an imperfect self-defense instruction. As the state appellate court noted, petitioner and the victim had not had contact for almost a year when petitioner sought out the victim by going to the victim's apartment building, where he proceeded to smash the victim's car and break into the victim's apartment with a mallet. Thereafter, petitioner confronted the victim, chased him onto the street, and stabbed him multiple times in front of witnesses. Petitioner continued to stab the victim even after police arrived on the scene and ordered him to stop, and petitioner specifically stated to police that he wanted the victim to die. To put it mildly, these are not the actions of a man who believes he is in imminent danger of death or great bodily injury from his victim. Although petitioner attributed his acts to the victim's Craiglist ad, nothing about that suggested that Frum posed an imminent threat. Further, the defense at trial was that the jury should return a verdict of voluntary manslaughter on the theory of provocation or heat of passion, and defense counsel did not request an imperfect self-defense instruction. Ex. 3 at 1193-94, 1383.

Finally, even if the failure to instruct on unreasonable self-defense as a lesser-included offense of murder was somehow erroneous, petitioner fails to demonstrate that the error had a substantial and injurious effect in determining the jury's verdict. See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Messer v. Runnels, No. 07-15151, 2009 WL 1464899, at *2 (9th Cir. 2009) (unpublished memorandum disposition) (applying Brecht in noncapital case to claim that trial

11

court failed to instruct on lesser-included offense of involuntary manslaughter); Ghent v. Woodford, 279 F.3d 1121, 1133-34 (9th Cir. 2002) (applying Brecht to a capital case for failure to instruct jury on lesser-included offense). Given the evidence presented at trial, for all the reasons discussed above, a reasonable jury properly instructed on imperfect self-defense could not possibly have found that at the time of the stabbing petitioner actually believed that the victim posed an *imminent* danger of death or great bodily injury. Therefore, the trial court's failure to instruct on imperfect self-defense did not result in prejudice.

Accordingly, petitioner is not entitled to federal habeas relief.

### C. Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. See Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. Id. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

12

## CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

**IT IS SO ORDERED.**

Dated: November 20, 2017

JON S. TIGAR
United States District Judge